IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-144

No. 511A20

Filed 5 November 2021

IN THE MATTER OF:  S.C.C.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered 20 August 2020 by Judge Jeanie R. Houston in District Court, Yadkin County.  This matter was calendared in the Supreme Court on 30 September 2021, but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*James N. Freeman, Jr., for petitioner-appellee Yadkin County Human Services Agency.*

*Paul W. Freeman, Jr., for appellee Guardian ad Litem.*

*Benjamin J. Kull for respondent-appellant mother.*

*Garron T. Michael for respondent-appellant father.*

ERVIN, Justice.

Respondent-mother Eden K. and respondent-father Lovell C. appeal from the trial court's order terminating their parental rights in their daughter, S.C.C.[1]  After careful consideration of the parents' challenges to the trial court's termination order, we conclude that it should be affirmed.

---

[1] S.C.C. will be referred to throughout the remainder of this opinion as "Sandra," which is a pseudonym used for ease of reading and to protect the identity of the juvenile.

Sandra was born in September 2015. On 9 February 2018, the Yadkin County Human Services Agency received a child protective services report alleging that Sandra was being neglected and that there were concerns about the presence of domestic violence and substance abuse in the home. On 12 February 2018, a social worker, accompanied by an officer of the Jonesville Police Department, went to respondent-mother's home for the purpose of investigating the allegations. At the time, Sandra lived with respondent-mother, her maternal grandmother, and her maternal great-grandparents.

As they were being interviewed by the social worker, the adults yelled at one another until the law enforcement officer who was in attendance managed to separate them. The adults told the social worker that they frequently argued among themselves. In addition, the social worker learned that, on 5 February 2018, a law enforcement officer had responded to a report concerning a domestic disturbance that had occurred at the residence.

On 11 February 2018, the maternal grandmother was arrested for possession of cocaine and released on bond on the same day. According to statements that respondent-mother made to a social worker, the maternal grandmother used impairing substances that had not been prescribed for her. Respondent-mother also had a history of substance abuse that included the use of heroin and other opiates. As a result of the fact that Sandra had been addicted to opiates at the time of her

birth, the child had not lived with respondent-mother for one year while respondent-mother underwent substance abuse treatment. Although respondent-mother had returned to the home five to six months before her interview with the social worker, respondent-mother admitted that she had relapsed and that, in the event that she was tested for the presence of controlled substances, the results would be positive for marijuana. In addition, Sandra's maternal great-grandfather reported that respondent-mother would leave Sandra with the maternal grandmother for weeks at a time and had only returned from such an absence two days before speaking with the social worker.

¶ 5    After determining that it was not safe for Sandra to continue residing in the home, the social worker transported Sandra and respondent-mother to the YCHSA office. In an attempt to make arrangements for Sandra's care, respondent-mother contacted respondent-father, who came to the YCHSA office. At that time, respondent-father informed agency employees that he did not know what took place in respondent-mother's home in spite of the fact that he had been contacted in the course of earlier child protective services assessments and that he had not ever served as Sandra's primary caretaker. While performing a background check concerning respondent-father, YCHSA discovered that there was an outstanding warrant for his arrest. As a result, respondent-father was taken into custody by law enforcement officers.

¶ 6        On 13 February 2018, YCHSA filed a juvenile petition alleging that Sandra was a neglected juvenile, obtained the entry of an order taking Sandra into non-secure custody, and placed Sandra in a licensed foster home. After a hearing held on 29 March 2018, the trial court entered an adjudication and disposition order on 23 April 2018 in which it determined that Sandra was a neglected juvenile, placed Sandra in YCHSA custody, awarded placement authority to YCHSA, and noted that both parents had entered into an Out of Home Family Services Agreement that had been developed for the purpose of remedying the problems that had led to Sandra's removal from the family home. The case plans adopted for the parents required each of them to complete a substance abuse assessment, submit to random drug screens, complete a psychological assessment and a parenting education program, maintain consistent employment, and obtain appropriate housing.

¶ 7        In an order that was entered on 13 July 2018 following a review hearing held on 14 June 2018, Judge David V. Byrd found that both parents had tested negative for the presence of controlled substances, completed a psychological assessment, and procured housing. In addition, respondent-father had obtained employment. On the other hand, the parents were "inconsistent" in their visits with Sandra, consistently claiming that their multiple cancelled visits stemmed from a "lack of transportation."

¶ 8        After a hearing held on 3 January 2019, Judge William F. Brooks entered a permanency planning order on 6 February 2019 in which he found that neither parent

had visited Sandra since August 2018, with the parents having attributed their failure to visit with Sandra to a lack of transportation and conflicting work schedules. In addition, the parents had failed to send Sandra any "letters, cards, gifts, or other tokens of love and affection during that same time period." Although Judge Brooks found that there was "very little bond, if any, between the [respondent-]parents and [Sandra,]" he concluded that reunification efforts would not "clearly" be unsuccessful and established a primary permanent plan of reunification coupled with a secondary plan of guardianship.

¶ 9      In a permanency planning order that was entered on 24 May 2019 following a hearing held on 26 April 2019, Judge Byrd found that the parents had resumed their visits with Sandra in January 2019. On the other hand, Judge Byrd found that, even though both parents were subject to child support orders and had been employed for the past year, respondent-mother had failed to pay any child support. In addition, Judge Byrd described the progress being made by both parents as "slow and delayed." Although the primary permanent plan for Sandra remained one of reunification, Judge Byrd changed the secondary plan to one of adoption.

¶ 10      After a hearing held on 29 August 2019, Judge Brooks entered a third permanency planning order on 1 October 2019 in which he found that, even though both parents had obtained a psychological assessment, the assessors had been unable to properly evaluate the parents in light of their "defensive" or "guarded" statements.

For that reason, Judge Brooks required the parents to submit to new psychological assessments. In addition, Judge Brooks found that, even though respondent-mother had been subject to a child support order that required her to pay $110 each month, plus an additional $20 monthly payment that was to be applied to an existing arrearage, since 11 November 2018 and respondent-father had been subject to a child support order that required him to pay $451 each month, plus an additional $59 monthly amount that was to be applied to an existing arrearage, since 1 June 2018, each parent had, "at most," made a single payment. As a result, Judge Brooks concluded that the parents "ha[d] made just enough progress during the life of this case to justify continuing to work towards reunification," ordered the parents to provide updated psychological assessments, changed the primary plan to one of adoption and the secondary plan to one of reunification, and ordered YCHSA to file a petition for the purpose of terminating the parents' parental rights in Sandra. On 20 November 2019, YCHSA filed a motion seeking the termination of the parents' parental rights in Sandra in which it alleged that the parents' parental rights were subject to termination on the basis of neglect, N.C.G.S. § 7B-1111(a)(1); willful failure to make reasonable progress toward correcting the conditions that had led to Sandra's removal from the family home, N.C.G.S. § 7B-1111(a)(2); and willfully failing to pay a reasonable portion of the cost of the care that Sandra had received after being taken into YCHSA custody, N.C.G.S. § 7B-1111(a)(3).

¶ 11        After a hearing held on 27 February 2020, the trial court entered an order on 31 March 2020 in which it concluded that continued efforts to reunite Sandra with either parent within a reasonable period of time would be unsuccessful and inconsistent with Sandra's health, safety, and need for a safe, permanent home. In addition, the trial court determined that continued visits between Sandra and the parents would be contrary to Sandra's best interests. After ordering that Sandra's primary permanent plan remain one of adoption, the trial court changed Sandra's secondary permanent plan to one of guardianship.

¶ 12        In the aftermath of a hearing held on 30 June 2020, the trial court entered a permanency planning order on 20 August 2020 in which it found that both parents were employed, that neither of them was disabled, and that neither of them had sought to have their existing child support obligation modified. In addition, the trial court found that respondent-father had never made a child support payment and that respondent-mother had never made a voluntary child support payment. After determining that both parents had failed to make reasonable progress toward satisfying the requirements of their case plans in the twenty-eight months since Sandra entered YCHSA custody, that there was no reasonable likelihood that the family could be reunited within a reasonable period of time, that the child's foster parent intended to adopt Sandra once the child became legally eligible for adoption, and that there were no concerns relating to Sandra's current placement given the

existence of a strong bond between Sandra and her foster parent, the trial court relieved YCHSA from any further obligation to continue to reunify Sandra with either of her parents.

¶ 13 The YCHSA termination motion also came on for hearing before the trial court at the 30 June 2020 session of the District Court, Yadkin County. On 20 August 2020, the trial court entered an order in which it found, by clear, cogent, and convincing evidence, that the parents' parental rights in Sandra were subject to termination on the basis of neglect, N.C.G.S. § 7B-1111(a)(1); willful failure to make reasonable progress toward correcting the conditions that had led to Sandra's removal from the family home, N.C.G.S. § 7B-1111(a)(2); and willful failure to pay a reasonable portion of the cost of the care that Sandra had received while in YCHSA custody, N.C.G.S. § 7B-1111(a)(3), and determined that the termination of the parents' parental rights would be in Sandra's best interests. As a result, the trial court terminated the parents' parental rights in Sandra. Both parents noted appeals to this Court from the trial court's termination order.

¶ 14 The relevant provisions of the North Carolina General Statutes establish a two-step process for the holding of a termination of parental rights proceeding consisting of an adjudicatory stage followed by a dispositional stage. At the adjudicatory stage, the trial court must determine whether any of the grounds for termination delineated in N.C.G.S. § 7B-1111(a) have been shown to exist on the basis

of clear, cogent, and convincing evidence. N.C.G.S. § 7B-1109(e)–(f) (2019). This Court "reviews a trial court's adjudication under N.C.G.S. § 7B-1109 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law.'" *In re C.B.C.*, 373 N.C. 16, 19 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). The existence of a single ground for termination is sufficient to support a trial court's adjudication decision. *See* N.C.G.S. § 7B-1111(a); *In re Moore*, 306 N.C. 394, 404 (1982) (stating that, "[i]f either of the three grounds aforesaid is supported by findings of fact based on clear, cogent and convincing evidence, the order appealed from should be affirmed"). As a result, we will begin our analysis of the parents' challenge to the trial court's termination order by determining whether the trial court properly found that the parents' parental rights in Sandra were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(3).

A trial court may terminate the parental rights of a parent in the event that:

> [t]he juvenile has been placed in the custody of a county department of social services . . . or a foster home, and the parent has for a continuous period of six months immediately preceding the filing of the petition or motion willfully failed to pay a reasonable portion of the cost of care for the juvenile although physically and financially able to do so.

N.C.G.S. § 7B-1111(a)(3) (2019). As we have previously stated:

> The cost of care refers to the amount it costs the Department of Social Services to care for the child, namely,

foster care. A parent is required to pay that portion of the cost of foster care for the child that is fair, just and equitable based upon the parent's ability or means to pay.

*In re J.M.*, 373 N.C. 352, 357 (2020) (cleaned up). According to respondent-parents, the trial court erred by determining that they had "willfully failed to pay a reasonable portion of the cost of care for the minor child although they [we]re physically and financially able to do so."[2] We disagree.

¶ 16     In its termination order, the trial court found as a fact that:

> 19.     A child support obligation in regard to [Sandra] was established with [respondent-father] on May 13th, 2019. [Respondent-father] has been employed . . . for the life of the obligation. He made approximately $7,000 in the first quarter of 2019, $8,000 in the second quarter, $5,000 in the third quarter, $6,200 in the fourth quarter and $8,000 in the first quarter of 2020. Pursuant to the NC child support guidelines his established obligation is $451.00 monthly. He is not disabled, has never been approved for any form of disability benefits and has never attempted to motion the Court to modify his obligation in any way. [Respondent-father] did not make a single payment towards [Sandra]'s child support in the 6 months preceding the filing of the TPR before the Court. [Respondent-father] has never made a single child support payment at all. His current arrearage is $12,907 and there is an outstanding order for his arrest based on child support contempt.
>
> 20.     A child support obligation in regard to [Sandra] was established with [respondent-mother] on October 22nd, 2018. [Respondent-mother] is employed, is

---

[2] Respondent-father has adopted the argument set forth in respondent-mother's brief with respect to the issue of whether his parental rights in Sandra were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(3).

> not disabled and has never been approved for any form of disability benefits. Pursuant to the NC child support guidelines her established obligation is $110.00 per month plus $20.00 monthly to be applied to her arrearage. [Respondent-mother] has never motioned the Court or attempted to modify her child support obligation in any way. [Respondent-mother] did not make a single payment of any kind towards [Sandra]'s child support in the 6 months preceding the filing of this TPR. In fact, she has never made a voluntary payment at all.
>
> 21. The Court finds that both [respondent-father] and [respondent-mother] have for a continuous period of more than 6 months immediately preceding the filing of this Motion for Termination of Parental Rights, failed to pay a reasonable portion of [Sandra]'s cost of care despite having been physically and financially capable of doing so.

Neither respondent-mother nor respondent-father has challenged the sufficiency of the evidentiary support for these findings of fact. *See In re T.N.H.*, 372 N.C. 403, 407 (2019) (stating that unchallenged findings of fact are deemed to be supported by competent evidence and are binding for purposes of appellate review).

¶ 17    In attempting to persuade us that the trial court erred by concluding that their parental rights in Sandra were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(3), the parents focus their attention upon this Court's decision in *In re J.M.*, 373 N.C. at 352 (2020), which addressed a parent's challenge to the trial court's finding that she had the ability to work in the period of time preceding the filing of the termination motion. *In re J.M.*, 373 N.C. at 358. In that case, after observing that the parent was subject to a valid child support order that had established her

ability to financially support her children, we affirmed the trial court's determination that the parent's parental rights were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(3) on the grounds that, since "[a] proper decree for child support will be based on the supporting parent's ability to pay as well as the child's needs, there is no requirement that petitioner independently prove or that the termination order find as fact respondent's ability to pay support during the relevant statutory time period." *Id.* at 359 (quoting *In re S.T.B.*, 235 N.C. App. 290, 296 (2014)).

¶ 18    According to the parents, the principle adopted in *In re J.M.* to the effect that a valid child support order is sufficient, without more, to establish a parent's ability to pay support involves the erroneous use of a "simplified analysis under N.C.G.S. § 7B-1111(a)(3)" and should be abandoned on the theory that "a trial court must consider and make findings about—at a minimum—the income, assets, and legitimate reasonable needs and expenses of the parent, regardless of whether the parent has a child support order." We are not persuaded by the parents' argument.

¶ 19    As this Court has previously held, "[a] finding that a parent has ability to pay support is essential to termination for nonsupport . . . ." *In re Ballard*, 311 N.C. 708, 716–17 (1984) (citing *In re Clark*, 303 N.C. 592 (1981)). According to well-established North Carolina law, a valid child support order must rest upon an analysis of "(1) the amount of support necessary to meet the reasonable needs of the child and (2) the relative ability of the parties to provide that amount." *Coble v. Coble*, 300 N.C. 708,

712 (1980) (cleaned up). In determining whether a parent's parental rights in a child are subject to termination pursuant to N.C.G.S. § 7B-1111(a)(3) in the context of a situation in which the parent is subject to a valid child support order, "there is no requirement that petitioner independently prove or that the termination order find as fact respondent's ability to pay support during the relevant statutory time period." *In re J.M.*, 373 N.C. at 359 (quoting *In re S.T.B.*, 235 N.C. App. at 296). Thus, this Court has directly and explicitly rejected the argument that the parents have advanced in opposition to the trial court's determination that their parental rights in Sandra were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(3).

¶ 20      The need for consistency with the principle of stare decisis causes us to reject the parents' challenge to the trial court's determination that their parental rights in Sandra were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(3) and their concomitant argument that *In re J.M.* should be overruled. As this Court has clearly stated:

> [i]t is . . . an established rule to abide by former precedents, stare decisis, where the same points come up again in litigation, as well to keep the scale of justice even and steady, and not liable to waver with every new judge's opinion, as also because, the law in that case being solemnly declared and determined what before was uncertain, and perhaps indifferent, is now become a permanent rule, which it is not in the breast of any subsequent judge to alter or swerve from according to his private sentiments; he being sworn to determine, not according to his private judgment, but according to the known laws and customs of the land—not delegated to

> pronounce a new law, but to maintain and expound the old
> one—*jus dicere et non jus dare.*

*McGill v. Town of Lumberton*, 218 N.C. 586, 591 (1940) (cleaned up); *see also Bacon v. Lee*, 353 N.C. 696, 712 (2001) (stating that "[a] primary goal of adjudicatory proceedings is the uniform application of law" and that, "[i]n furtherance of this objective, courts generally consider themselves bound by prior precedent, *i.e.*, the doctrine of stare decisis" (citing *Payne v. Tennessee*, 501 U.S. 808, 827 (1991) (stating that "[s]tare decisis is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process"). As a result, in light of the critical function played by the doctrine of stare decisis in our legal system we adhere to our prior decision in *In re J.M.* and decline the parents' invitation to revisit the issue that was decided in that case.

A careful analysis of the trial court's unchallenged findings of fact shows the existence of ample support for its conclusion that the parents had willfully failed to pay a reasonable portion of the cost of care for Sandra despite having the physical and financial ability to do so. *See In re J.A.E.W.*, 375 N.C. 112, 117–18 (2020) (affirming a determination that a parent's parental rights in a child were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(3) based upon the fact that, even though the parent had income during the relevant period, no contribution at all was made toward the payment of the child's expenses and stating that the parents' "living

expenses might be relevant evidence to be taken into account if he had made some child support payments during the applicable time period and the issue was whether the amount he contributed to the cost of [the minor child]'s care was reasonable"). As a result, the trial court did not err by determining that the parents' parental rights in Sandra were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(3). In view of our determination that the trial court did not err by concluding that the ground for termination established by N.C.G.S. 7B-1111(a)(3) existed in this case, *In re E.H.P.*, 372 N.C. 388, 395 (2019), we need not address the parents' challenge to the trial court's conclusion that their parental rights in Sandra were also subject to termination for neglect pursuant to N.C.G.S. § 7B-1111(a)(1) and willful failure to make reasonable progress toward correcting the conditions that had led to Sandra's removal from the family home pursuant to N.C.G.S. § 7B-1111(a)(2).

¶ 22     In the event that the trial court finds the existence of one or more of the grounds for termination delineated in N.C.G.S. § 7B-1111(a), it is required to proceed to the dispositional stage, at which it "shall determine whether terminating the parent's rights is in the juvenile's best interest." N.C.G.S. § 7B-1110(a) (2019). In making its dispositional decision,

> [t]he court may consider any evidence, including hearsay evidence as defined in G.S. 8C-1, Rule 801, that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile. In each case, the court shall consider the following criteria and make written findings regarding the following that are relevant:

(1)     The age of the juvenile.

(2)     The likelihood of adoption of the juvenile.

(3)     Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.

(4)     The bond between the juvenile and the parent.

(5)     The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.

(6)     Any relevant consideration.

N.C.G.S. § 7B-1110(a) (2019).  We review the trial court's dispositional findings of fact to determine whether they are supported by the evidence received during the termination hearing, *see In re J.J.B.*, 374 N.C. 787, 793 (2020), with a reviewing court being "bound by all uncontested dispositional findings." *In re E.F.*, 375 N.C. 88, 91 (2020) (citing *In re Z.L.W.*, 372 N.C. 432, 437 (2019)).  The trial court's dispositional decision is evaluated on appeal using an abuse of discretion standard of appellate review. *In re A.U.D.*, 373 N.C. 3, 6 (2019).  "Under this standard, we defer to the trial court's decision unless it is 'manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision.' " *J.J.B.*, 374 N.C. at 791 (quoting *In re Z.A.M.*, 374 N.C. 88, 100 (2020)).

¶ 23     In the dispositional portion of its termination order, the trial court found that Sandra had not experienced emotional or developmental delays and did not have any

ongoing medical problems; that the foster home in which Sandra resided was safe and appropriate; that Sandra's foster parent would adopt her as soon as it was legally possible for the foster parent to do so; that it had no concerns about the appropriateness of Sandra's current placement; that Sandra's foster parent was gainfully employed, did not suffer from any physical or mental disability or other similar limitation and had the ability to provide for Sandra's financial, mental, and physical health needs; that Sandra and her foster parent were "strongly bonded"; that terminating the parents' parental rights in Sandra was the only remaining barrier to implementing the permanent plan of adoption; and that "[t]here [wa]s no reasonable probability that the family unit c[ould] be reunited within a reasonable or foreseeable period of time." As part of this process, the trial court made the following unchallenged findings of fact relating to the dispositional criteria enumerated in N.C.G.S. § 7B-1110(a):

a. The minor child is only four years old and she has been in foster care for approximately 28 months.

b. There is a very high likelihood that [Sandra] will be adopted by her current foster parent.

c. Termination of the parents' parental rights will aid in the accomplishment of the permanent plan for the juvenile.

d. There is no bond between the minor child and her biological parents.

> e.  There is a strong and loving bond between [Sandra] and
>     her foster mother.
>
> f.  The minor child is deserving of a stable home free from
>     domestic violence, substance abuse, and strife where
>     her needs will be attended to until she reaches
>     adulthood. She is further deserving of permanency and
>     an opportunity to flourish and excel. Terminating her
>     parents' parental rights will further these objectives.

¶ 24    In urging us to overturn the trial court's dispositional decision, the parents argue that the trial court's finding that Sandra has "no reasonable probability" of being reunified with respondents "within a reasonable or foreseeable period of time" lacks sufficient evidentiary support. According to the parents, the only barrier precluding their reunification with Sandra consisted of their poverty, which deprived them of the ability to afford the services that were required by their case plans. We do not find this argument persuasive.

¶ 25    A review of the trial court's unchallenged findings of fact reveals that Sandra was placed in foster care on 13 February 2018 and that she had been in foster care for 28 months at the time of the termination hearing. Although the parents were allowed to have supervised visits with Sandra twice each month, neither of them took advantage of their opportunity for a visit with Sandra during the period between August 2018 and January 2019. In addition, the record reflects that the aspects of their case plans that the parents failed to complete, including mental health evaluations and random drug screens, were initially made available to them by

YCHSA; that, even though each parent participated in a psychological assessment, the results of that process were inconclusive given their "defensive" or "guarded" responses; and that YCHSA provided drug screens to the parents until they indicated that they could not participate in the drug screening process in light of the transportation-related difficulties that they were experiencing. Although the parents' residence was found to be appropriate for a child, the trial court found that, "at no point in time since the minor child came into care, has the visitation plan been expanded to include unsupervised/overnight visitation or a trial home placement," with visitation between the parents and Sandra having been ended on 27 February 2020. As a result, we hold that the trial court's unchallenged findings support its determination that, as of the date of the termination hearing, there was no reasonable probability that the parents could be reunited with Sandra within a reasonable period of time. *See In re R.D.*, 376 N.C. 244, 258 (2020) (stating that, "[i]n making findings of fact, 'it is the trial judge's duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn from the testimony'" (quoting *In re T.N.H.*, 372 N.C. 403, 411 (2019))).

¶ 26      In addition, the parents argue that the trial court's finding that they had "no bond" with Sandra was devoid of record support. However, a social worker testified that, as of the date of the termination hearing, "there is not a strong bond between [Sandra] and the parents as visitation ha[d] been ceased since February 27th, 2020."

In addition, the guardian ad litem's report, which was admitted into evidence at the dispositional hearing, stated that:

- Although there was no bond observed between [Sandra] and her parents who did not visit her at all for the first 6 months she was in YCHSA custody, they began visiting in January 2019.

- At first [Sandra] was afraid of [her parents]. She resisted going to visits and had nightmares about "the man coming to get her."

- With time, [Sandra] became more comfortable and GAL observed she was willing to play with her parents in the YCHSA meeting room, however, GAL never observed [Sandra] act with affection toward them. She was observed to be willing to play with them, but resistant to hugs. She was always anxious to go "home."

- More recently, [Sandra] became so anxious about visiting her parents that it affected her behaviors both at home and school. Visits were stopped on her therapist's advice.

As a result, we hold that the record contains ample evidentiary support for the trial court's finding that there was no bond between Sandra and her parents. *In re R.D.*, 376 N.C. at 258 (stating that "findings of fact are binding 'where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary'" (quoting *In re Montgomery*, 311 N.C. 101, 110–11 (1984))).

Thus, we hold that the trial court's dispositional findings adequately address the dispositional criteria enumerated in N.C.G.S. § 7B-1110(a) and demonstrate that the trial court, having made a reasonable dispositional decision, did not abuse its

discretion in determining that the termination of the parents' parental rights would be in Sandra's best interests.  As a result, given that the trial court did not commit any error of law in determining that the parents' parental rights in Sandra were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(3) and did not abuse its discretion in determining that the termination of the parents' parental rights would be in Sandra's best interests, the trial court's termination order is affirmed with respect to both parents.

AFFIRMED.